# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| v. | § § § § | Case No. 4:15CR131 |
| ERIK DANIEL GOMEZ DIAZ (2) | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

The Court held a hearing on Defendant's Motion to Suppress (Dkt. 24) on December 16, 2015. The Court has considered the record before it and the argument and evidence presented at the hearing. As set forth below, the Court finds that the motion should be DENIED.

Defendant is charged in this matter with a violation of 21 U.S.C. § 846, conspiracy to possess with the intent to manufacture and distribute heroin.

Defendant was stopped on June 12, 2015 by an officer with the Sulphur Springs Police Department Texas Department while he was driving a minivan down IH-30 with co-Defendant Rita Talavera as his passenger. The officer informed him he was following a truck too closely. After some questioning regarding his travel plans, officers eventually searched the minivan and found drugs hidden inside.

Although his written motion is very brief in its authorities and arguments, Defendant seeks to suppress all tangible evidence seized on June 12, 2015, all written and oral statements made by Defendant to any law enforcement officers or others in connection with this case, any testimony by

law enforcement regarding same, and Defendant's identity which was discovered as a result of the stop.

Defendant argues that the warrantless arrest and search of the vehicle were without either probable cause, reasonable suspicion or other lawful authority in violation of Defendant's constitutional rights and that the prolonged detention of Defendant was in violation of his constitutional rights. Defendant also argues that any statements obtained from Defendant were obtained as fruits of the illegal search and seizures, that Defendant's consent to search the vehicle was not lawfully obtained, and that the search of the vehicle exceeded the scope of any consent provided.

At the December 16, 2015 hearing, Officer Brian Shurtleff testified about the traffic stop at issue. The Government also introduced into evidence a video recording of the stop.

### ANALYSIS

The Court first addresses Defendant's challenge to the traffic stop. Traffic stops are considered seizures within the meaning of the Fourth Amendment. *U.S. v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003); *see Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed.2d 660 (1979). The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 899 (1968) and its progeny. *See Knowles v. Iowa*, 525 U.S. 113, 117, 119 S. Ct. 484, 142 L. Ed.2d 492 (1998); *U.S. v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). To determine whether a seizure is reasonable, the court considers (1) "whether

the officer's action was justified at its inception," and (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *U.S. v. Brigham*, 382 F.3d 500, 506 (quoting *Terry* at 19-20, 88 S. Ct. 1868).

When considering whether an officer's actions were justified at their inception, the Supreme Court has stated that the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot." *U.S. v. Arvivu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750, 151 L. Ed.2d 740 (2002) (quoting *Terry* at 30, 88 S. Ct. 1868). The Supreme Court has specifically instructed that, when reviewing courts make reasonable suspicion determinations, they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *Id*. (quoting *U.S. v. Cortez*, 449 U.S. 411, 417-418, 101 S. Ct. 690, 66 L. Ed.2d 621 (1981)). The totality of the circumstances standard allows officers to draw on their own experience and specialized training to make inferences from and deductions about cumulative information available to them that might "well elude an untrained person." *Id*. (quoting *Cortez* at 418, 101 S. Ct. 690). An officer may not rely on a mere "hunch" in order to justify a stop. *Terry* at 27, 88 S. Ct. 1868. However, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *Arvivu*, 534 U.S. at 274, 122 S. Ct. 744.

The Fifth Circuit has applied the first prong of the *Terry* test to traffic stop situations. For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion

3

that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. *U.S. v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010). A reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. *Id.*; *see*, *e.g.*, *U.S. v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002).

Here, Officer Shurtleff testified that he saw Defendant's minivan follow too closely to an 18-wheeler which he stated was a violation of the Texas Transportation Code. Section 545.062 of the Transportation Code provides that:

> (a) An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway.

TEX. TRANSP. CODE § 545.062(a). When evaluating whether there is probable cause to find a violation of Section 545.062(a), "it is a better practice to require law enforcement officers to articulate the factual basis as to why they believe that a vehicle is traveling too closely to another, rather than just rendering an opinion or conclusion." *United States v. Dioubate*, 2013 WL 6504287, at *5 (E.D. Tex. 2013) (internal citations omitted) (report and recommendation adopted by U.S. District Judge Marcia A. Crone).

Here, Shurtleff's testimony sets forth the factual basis as to why he believed Defendant's minivan was following too closely. According to Shurtleff, there was less than two car lengths distance between Defendant's minivan and the truck, traffic was congested but averaging 70 miles

per hour, and 30 feet distance is too close at such speeds. Based on this testimony, the Court finds that there was probable cause to believe that Defendant could not safely stop without colliding with 18-wheeler in front of him or veering into another vehicle, object, or person on or near the highway.[1]

Shurtleff was very credible in his testimony regarding the traffic stop at issue. *United States v. Gonzalez*, 2015 WL 4231726, at *4 (N.D. Tex. 2015) ("For defendant ... to prevail, it would have to be shown that Trooper Riefers was either mistaken or that his testimony was not credible."). Although Defendant's counsel appeared to challenge the distance between the minivan and the 18-wheeler by arguing that the video did not depict such, Officer Shurtleff specifically testified that he observed the minivan following too closely before the recording started. His testimony regarding the reasons for the stop, which was credible and uncontradicted by any other evidence, "is more than a mere conclusion or opinion and constitutes specific and articulable facts in support of his reasonable suspicion that [Defendant] had committed the traffic violation of following too closely." *United States v. Dioubate*, 2013 WL 6504287, at *5 (E.D. Tex. 2013); *see also United States v. Flores Manjarez*, 421 Fed. App'x 407, 409 (5th Cir. 2011) ("because the officer provided specific, articulable facts, which were uncontradicted, in support of his reasonable suspicion that Flores had committed the traffic violation of following too closely, Flores has failed to show any plain error in connection with the validity of the traffic stop.").

---

[1] The Court also notes that Officer Shurtleff testified that once Defendant passed him, it took approximately 2-3 minutes to get out of stationary position and get behind Defendant's car. By this time, Defendant slowed to 15 mph under speed limit, also a dangerous condition according to Shurtleff.

The Court notes that the Government concedes that law enforcement received information from a DEA wire that Defendant's car may be carrying narcotics as part of an active investigation in another state. Indeed, Officer Shurtleff testified that he was told to develop probable cause to stop the vehicle and immediately started to look for a vehicle matching the description. The Court also notes that Shurtleff testified that he did not put the DEA information in his initial report of the stop. That the officer may have had ulterior motives in stopping Defendant has no bearing on the Court's analysis here. "It is well established that so long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *United States v. Harris*, 566 F.3d 422, 434 (5th Cir. 2009) (internal alterations and quotation marks omitted). Based on the record before it, the Court finds that the stop of the minivan was objectively justified and did not violate the Fourth Amendment.

The Court next addresses Defendant's argument that the duration of the traffic stop exceeded the permissible limits of the stop and rendered it an illegal seizure. The Court is not convinced.

The second prong of the *Terry* test requires that the court consider whether the police officer's actions after a legitimate traffic stop were "reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. Such a limitation exists because the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id*. (quoting *U.S. v. Dortch*, 199 F.3d 193 (5th Cir. 1999)). In the

course of effectuating a traffic stop, a police officer may examine the driver's license and registration and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. *Id*. at 507-508. An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. *Id*. at 508. In fact, the Fifth Circuit, specifically considering the scope of such questioning, has rejected "any notion that a police officer's questioning, *even on a subject unrelated to the purpose of a routine traffic stop*, is itself a Fourth Amendment violation." *U.S. v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) (emphasis original). Detention, not questioning, is the evil at which *Terry*'s second prong is aimed. *Brigham*, 382 F.3d at 508.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, then there can be no more reasonable suspicion, and, as a general matter, any continued questioning thereafter unconstitutionally prolongs detention. *Id*. at 510. A recognized exception to this rule is when additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled. *Id*. at 507; *U.S. v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). If this occurs, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *Id*.

At the hearing, the Government offered the video recording of the traffic stop taken from Shurtleff's dash-camera. Shurtleff again offered credible testimony to show why reasonable suspicion arose and continued to develop during the duration of the stop.

Shurtleff testified that once her pulled the minivan over, he asked Defendant for his license and insurance and Defendant exited the minivan. According to Shurtleff, Defendant was sucking

7

on a piece of plastic in a very unusual and nervous manner.

Shurtleff testified that less than 3 minutes passed between stopping Defendant and starting the license check. While waiting for the license check, Officer Shurtleff engaged Defendant in conversation about his travel plans. Defendant told the officer that he lived in Tennessee and had driven from Nashville to Dallas to visit his cousin. Shurtleff noted that Defendant's drivers license was a California license; Shurtleff testified that this seemed suspicious.

Although some of the audio recording is indecipherable due to the highway noise, the Court notes that much of the conversation between Shurtleff and Defendant is in very broken Spanish. Officer Shurtleff conceded that there was somewhat of a language barrier between him and Defendant but he felt that they were "both getting each other's points."

Officer Shurtleff then questioned the female passenger, co-Defendant Rita Talavera, about the couple's travel planes. According to Shurtleff, Talavera tapped her foot in a nervous manner when answering his questions and also made a gesture with her hands indicating nervousness when the minivan was initially pulled over. Shurtleff testified that Talavera told him in English that they rode a bus from California to Dallas. Officer Shurtleff testified that he was again suspicious because they had a dog with them and there was no way it would have been allowed on the bus. Talavera told him that they went to Dallas to ask his cousin to be in their wedding and that his cousin let them borrow the minivan.

According to Shurtleff, Talavera's claim that the minivan was not their minivan increased his suspicion because the insurance card provided by Defendant had Defendant's name on it and had

been issued that day. The Government offered into evidence a copy of the insurance card issued to Defendant for the minivan stopped by Officer Shurtleff. The insurance card was issued approximately 6 hours before the traffic stop and lists a Dallas address for Defendant. Both Defendant and Talavera are listed on the insurance card.

When Shurtleff got Defendant's license back, it came back clear. Shurtleff then ran Talavera's identification. He testified that one reason he asked for her identification is that he planned on asking for consent to search the van and that he always prefers to have all individuals identified before he obtains any consent.

Shurtleff testified that he then asked Defendant for consent to search the vehicle. According to Shurtleff, Defendant appeared to understand him and indicated yes by nodding in the affirmative. Shurtleff testified that he then asked Talavera, who spoke perfect English according to Shurtleff, to translate his request again into Spanish. Defendant again consented. According to Shurtleff, Defendant's head nod was not recorded because Defendant was not in the camera frame when the consent was given.

Shurtleff testified that he conducted a preliminary search of vehicle by looking inside the vehicle; he did not find anything in plain view. Then, Shurtleff testified, he removed Defendant's dog from the minivan and used his canine officer, Ice, to circle the vehicle. According to Shurtleff, Ice alerted at the rear hatch of the minivan. After that, Shurtleff returned Ice to the patrol car and continued his search based on the positive alert from Ice.[2]

---

[2]Defendant has offered no argument or authorities to challenge Ice's training or reliability. Because no grounds for suppression of the canine alert have been presented to the Court, the

Shurtleff then noticed that the air conditioning was not blowing cool air, despite being set to the highest setting. Shurtleff also saw tool markings on the dash and missing screws on the radio and removed the radio. According to Shurtleff, these were all factors that indicated to him that the dashboard has been recently removed. The minivan was then taken to a secure location at the Hopkins County Sheriff's office and the dashboard was removed. Shurtleff testified such a search was too complex to do on the side of the road. According to Shurtleff, 12 bundles of drugs were found hidden inside. At least one bundle field tested positive for heroin.[3]

Having considered the record before it, the Court finds that, after stopping Defendant, Officer Shurtleff had a reasonable suspicion that criminal activity may be afoot. Given the totality of circumstances in this case, it is clear that the reasonable suspicion of criminal activity remained and only increased as time passed. *Scroggins*, 599 F.3d at 441 ("reasonable suspicion may 'ripen' or 'develop' into probable cause for an arrest if a *Terry* stop reveals further evidence of criminal conduct.").

As Shurtleff very credibly testified, there were numerous indicators leading to his belief that criminal activity may be afoot to justified the continued detention of Defendant. Such indicators included Defendant's extreme speed reduction, Talavera's gestures at the time of the stop indicating she was worried, nervousness of Defendant sucking on plastic, pacing and stretching, Talavera's nervous foot tapping, and the driver's and passenger's inconsistent stories about travel plans and

---

Court does not address it in its findings herein.

[3]According to Shurtleff, some of the seized bundles may have later tested positive for cocaine but this is not otherwise addressed in the record.

insurance policy information. And, although Shurtleff conceded that he did not release Defendant immediately when Defendant's license came back clear, he testified that his suspicion had increased based on the nervous indicators he had already observed and his conversation with Talavera.

That Shurtleff continued to question Talavera after Defendant's license came back clear did not make the detention prolonged. As explained by the Fifth Circuit:

> In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation. Thus, when a police officer reasonably suspects only that someone is carrying a gun and stops and frisks that person, the officer, after finding nothing in a pat down, may not thereafter further detain the person merely to question him about a fraud offense. This is not because the questioning itself is unlawful, but because at that point suspicion of weapons possession has evaporated and no longer justifies further detention. When the officer is satisfied that the individual is not carrying a gun, the officer may not detain him longer to investigate a charge lacking reasonable suspicion.

*U.S. v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993).

The Court finds that the detention of Defendant prior to his consent lasted no longer than was necessary to effectuate the purpose of the stop and that further reasonable suspicion emerged as the stop continued. The Court finds that, considering the totality of the circumstances, the period of pre-consent detention was a reasonable amount of time to detain Defendant.

The Court also finds based on the record before it that Defendant consented to the search of the minivan. The Supreme Court has held that Fourth Amendment does not bar an officer from continuing to question a suspect even after all reasonable suspicion has been dispelled so long as the suspect provides consent. The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "voluntariness is a question of fact to be determined from all the

circumstances." *Ohio v. Robinette*, 519 U.S. 33, 41, 117 S. Ct. 417, 136 L. Ed.2d 347 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973)). At its heart, the issue of voluntariness is governed by whether a reasonable person would understand that he or she is free to refuse.

Here, nothing before the Court indicates that Shurtleff coerced or threatened Defendant to consent or that the consent was not voluntarily made. *Cf. U.S. v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) ("the consent to search was not an independent act of free will, but rather a product of the unlawfully extended detention."). Although Officer Shurtleff conceded that he did not know whether Talavera's interpretation of his request for consent was correctly interpreted from English to Spanish, there is no evidence before the Court that would show otherwise. Further, Shurtleff credibly testified that Defendant consented when he asked Defendant and when Talavera translated for him. That Defendant's nonverbal nodding was not on the video recording because of where Defendant was standing does not make the consent any less knowing or voluntary.

Further, although Shurtleff stated that Defendant was on the side of the road and not free to go when he was searching the minivan, no evidence was presented at the hearing regarding any custodial interrogation of Defendant, nor has Defendant any specific statements he seeks to suppress. There is no basis for suppression based on this argument. Nor is there any basis to suppress Defendant's identity obtained as a result of the stop.

For these reasons, the Court recommends that Defendant's Motion to Suppress (Dkt. 24) be DENIED in its entirety.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C.A. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 23rd day of December, 2015.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE